UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEHRDAD VALIBEIGI,<br><br>       *Plaintiff*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>       *Defendant*. | Civil Action No. 22-3149 (TJK) |

**MEMORANDUM OPINION**

Mehrdad Valibeigi alleges that, over the last few years, the District of Columbia sued him and his corporations and obtained civil judgments against them for failing to maintain three apartment buildings in compliance with the District's housing laws and regulations. Proceeding pro se here, he alleges that, in doing so, the District violated his rights under the First, Fourth, Fifth, and Fourteenth Amendments. The District moves to dismiss, arguing that Valibeigi's claims are time-barred and that he has failed to plausibly allege any constitutional violations or municipal liability. The Court agrees with the latter two reasons and will dismiss the complaint.

**I.    Background**

In his Amended Complaint, Valibeigi alleges that he owned three residential apartment complexes in the District—Bennington Apartments, Astor Place Apartments, and Westwood. ECF No. 4 ¶¶ 5, 7–10. But "as the result of increased gang activities around [those] properties," the three complexes developed "physical and financial management challenges" that led to various "housing code violations verified by" District officials. *Id.* ¶ 7. Valibeigi says that those violations eventually prompted the District, through the Office of the Attorney General ("OAG"), to sue him and his corporations under the Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-

3901 *et seq.*, and the Tenant Receivership Act ("TRA"), D.C. Code § 42-3651.01 *et seq.* ECF No. 4 ¶¶ 7–10.

While those lawsuits were pending, Valibeigi tried to sell the Bennington and Astor properties, but each sale fell through. ECF No. 4 ¶¶ 10–17. He also tried to renovate the Bennington property, but the renovation company backed out of the contract in the middle of these legal disputes, supposedly because of false statements made by an attorney for the OAG. *Id.* ¶ 11. Eventually, Valibeigi claims that he and his companies were forced into bankruptcy and had to sell the three apartment complexes. *Id.* ¶¶ 14–19. Thus, he alleges that he has suffered various "financial, emotional and reputational harms" from the District's actions. *Id.* at 3.

Valibeigi sued the District in October 2022 and amended his complaint two months later. *See* ECF Nos. 1, 4. He asserts that the District violated the First, Fourth, Fifth, and Fourteenth Amendments by discriminating against him, "Torpedo[ing] the Sale of [his] Properties," and "Rel[ying] on Misinformation and False Statements." ECF No. 4 ¶¶ 33–47. As to the alleged discrimination, he claims that the District engaged in selective enforcement through (1) treating him and other small, private landlords differently than the District of Columbia Housing Authority ("DCHA") by suing them under the CPPA and TRA, rather than the Nuisance Abatement Act ("NAA"); and (2) targeting properties for enforcement in or near less well-off areas of the District. *See id.* at 2, ¶¶ 33–38. Valibeigi alleges no statutory basis for these claims, but the Court liberally construes his pro se complaint as brought under 42 U.S.C. § 1983.

The District moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II.   Legal Standards

"To survive a motion to dismiss under Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Frederick*

*Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1135 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  For a complaint to be facially plausible, "it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  Additionally, when reviewing a motion to dismiss for failure to state a claim, "the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  *Id.* (*Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Even so, the complaint must be "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[M]ere conclusory statements" cannot establish a claim plausible on its face.  *Iqbal*, 556 U.S. at 678.

Additionally, when a complaint is filed pro se, it "must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").  But "this benefit is not [] a license to ignore the Federal Rules of Civil Procedure."  *Fontaine v. JPMorgan Chase Bank, N.A.*, 42 F. Supp. 3d 102, 106 (D.D.C. 2014) (alteration in original) (quoting *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009)).

**III.    Analysis**

Under 42 U.S.C. § 1983, a plaintiff may sue any "person" who, under color of law, has "subject[ed]" the plaintiff "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  For purposes of this statute, a municipality or local government qualifies as a "person."  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  But municipalities "are not liable for injuries inflicted solely by their employees or

3

agents." *Frederick Douglass Found., Inc.*, 82 F.4th at 1136.  Nor can they "be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.  Instead, for a municipal government to be liable under § 1983, the government must be the 'moving force' behind the violation," and the violation must be "the result of an official custom or policy."  *Frederick Douglass Found., Inc.*, 82 F.4th at 1136 (quoting *Monell*, 436 U.S. at 694).

"Accordingly, in considering whether a plaintiff has stated a claim for municipal liability" under § 1983, a district court must address two distinct questions.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  The first is whether the plaintiff has plausibly alleged that any of his rights were violated—that is, whether he was "deprived of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see Baker*, 326 F.3d at 1306.  The second is whether the violation is fairly attributable to the municipality, rather than a rogue employee or official:  Does "the complaint state[] a claim that a custom or policy of the municipality caused the violation"?  *Baker*, 326 F.3d at 1306.  Either is enough to doom a complaint, but here, Valibeigi's operative complaint comes up short on both counts.

### A.     Valibeigi Has Not Plausibly Alleged a Constitutional Violation

#### 1.     Fifth Amendment Claim

Valibeigi's main claim is that the District discriminated against him in violation of the Fifth Amendment.  He alleges that the District engaged in selective enforcement by (1) treating him and other small, private landlords differently than the DCHA by suing them the under the CPPA and TRA, rather than the NAA; and (2) targeting properties for enforcement in or near the District's poorer neighborhoods.[1]  ECF No. 4 at 2, ¶¶ 33–38.  "A selective enforcement claim has two

---

[1] Valibeigi also grounds his discrimination claim in the Fourteenth Amendment, but "the Fourteenth Amendment does not apply to the District of Columbia or its officials/employees."

elements: a plaintiff must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right."[2] *Frederick Douglass Found., Inc.*, 82 F.4th at 1136.

The first of these two elements reflects that "[s]elective enforcement claims require courts to separate unlawful discrimination from the ordinary and lawful exercise of prosecutorial discretion." *Frederick Douglass Found., Inc.*, 82 F.4th at 1136. And there is a strong presumption that prosecutors act lawfully when carrying out their duties.[3] *Id.* at 1137. To displace that presumption and state a claim, a plaintiff must plausibly allege that there are "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to [the plaintiff]." *Id.* (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)). Only then can a prosecutor be reasonably inferred to have acted based on "'unlawful favoritism,' rather than lawful prosecutorial considerations." *Id.* (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002)). Thus, a plaintiff must allege sufficient factual matter on which a court can conclude that "a plaintiff is similarly situated to a person against whom the law was not enforced across the relevant prosecutorial factors." *Frederick Douglass Found., Inc.*, 82 F.4th at 1137. Though not exclusive, such factors include "the strength of the case, the prosecution's general

---

*Smith v. District of Columbia*, 149 F. Supp. 128, 133 (D.D.C. 2015); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

[2] "In the context of an equal protection selective enforcement claim, a plaintiff must show that others similarly situated were not prosecuted and that the prosecution was motivated by invidious discrimination." *Frederick Douglass Found., Inc.*, 82 F.4th at 1147. In other words, the second element requires a plaintiff to allege that the disparate treatment was motivated by an "animus" against the targeted group. *Id.* (quotation omitted).

[3] Deference to prosecutorial discretion applies even in the civil enforcement context. *See United States v. AT & T Inc.*, 290 F. Supp. 3d 1, 1, 3 (D.D.C. 2018) (discussing prosecutorial discretion in the context of a selective enforcement defense to a civil antitrust suit).

5

deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Valibeigi comes up short in pleading the first element of a selective enforcement claim. He does not allege any facts which, if proven, would show that he and his purported comparators—the DCHA and private landlords who own property in more affluent areas of the District—were similarly situated "across the relevant prosecutorial factors." *See Frederick Douglass Found., Inc.*, 82 F.4th at 1137.

Start with the DCHA. The closest Valibeigi comes is asserting that "the conditions of the properties under the DCHA were equal or far worse than the condition of the Plaintiff's properties." ECF No. 4 ¶ 34. Even if true, that bare-bones assertion is still not enough to plausibly state a claim because Valibeigi's cursory allegation about this *one* prosecutorial factor does not plead that he was similarly situated to the DCHA "across *a range* of relevant prosecutorial factors." *Frederick Douglass Found., Inc.*, 82 F.4th at 1138 (emphasis added). And it is not hard to imagine why those other factors might lead the OAG to treat the DCHA differently from small, private landlords when it comes to enforcement litigation. For example, the OAG may well have other methods of forcing the DCHA to comply with the District's laws and regulations because of its status as a public entity.[4] That distinction only underscores that Valibeigi has not come close to plausibly alleging that he is similarly situated to the DCHA across the relevant prosecutorial factors.

Valibeigi has also not plausibly alleged that he is similarly situated to any of the private

---

[4] As Valibeigi notes, some of the DCHA's Board of Commissioners are appointed by District officials. *See* ECF No. 20 at 9–11; *see also* D.C. Code § 6-211(a); *cf. Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355, 2366 (2023) (noting that a government's power to appoint the leaders of an organization shows a government's "supervision and control" over that organization).

landlords who own property in more affluent parts of the city. Most tellingly, Valibeigi does not describe any situation in which the District failed to bring suit against such a landlord when that landlord's property had violations like those present at his three apartment buildings. At most, he alleges that, in the aggregate, landlords in poorer areas of the city "abate almost the same percentage of violations compared to the owners in the [Affluent Wards]." ECF No. 4 ¶ 37. He also points to some data, attached to the Amended Complaint as an exhibit, showing that the District brought more civil enforcement actions over the past several years against private landlords owning properties in areas of the District he characterized as "transitional" rather than "affluent." *See id.* at 18. But none of that says anything about the relative merits of any specific case of enforcement or non-enforcement by the District. In this case, Valibeigi has failed to identify a single "person against whom the law was not enforced," much less one similarly situated to Valibeigi "across the relevant prosecutorial factors." *See Frederick Douglass Found., Inc.*, 82 F.4th at 1137.

Thus, Valibeigi has failed to plausibly plead that the District selectively prosecuted him in violation of the Fifth Amendment.[5]

### 2. First and Fourth Amendment Claims

Next, Valibeigi claims that "the District violated [his] rights to 'Free Commerce,'" "[b]y intervening and interrupting the standard course of doing business in renovating and selling of [his] properties." ECF No. 4 ¶ 47; *see also id.* at 11 ("District Torpedoed the Sale of Plaintiff's Properties"). Valibeigi grounds this supposed right to "Free Commerce" in the First and Fourth Amendments. He alleges that "Free Commerce has been argued to be an extension to" the free-

---

[5] Valibeigi also alleges that the District, through one of its attorneys, "pursu[ed] . . . its discriminatory conduct" by "Rel[ying] on Misinformation and False Statements." ECF No. 4 at 11, ¶ 42. He has not, however, identified any authority suggesting that such conduct alone violates the equal-protection component of the Fifth Amendment or any other constitutional provision.

speech rights guaranteed by those Amendments. ECF No. 4 ¶ 47. But he cites no authority for this proposition. To the contrary, "[t]he framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think,'" not the freedom to renovate and sell real estate. *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660–661 (2000)). And the Fourth Amendment provides security against "unreasonable searches and seizures"; it does not concern commerce or free speech. U.S. Const. amend. IV.[6]

Thus, Valibeigi has not plausibly alleged that he suffered a violation of his First or Fourth Amendment rights.

### B.     Municipal Liability

Even if Valibeigi had plausibly alleged that his constitutional rights were violated, his complaint would still fail because it does not plausibly allege that those violations are fairly attributable to the District. To repeat, municipalities can only be held liable under § 1983 for their own misconduct. *Frederick Douglass Found., Inc.*, 82 F.4th at 1148. In the selective enforcement arena, that requires a plaintiff to "plausibly allege [that] the enforcement at issue was 'pursuant to official municipal policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691).

Official policy generally comes in one of four forms. As the D.C. Circuit has explained, "[o]fficial policies include '[1] the decisions of a government's lawmakers, [2] the acts of its policymaking officials, and [3] practices so persistent and widespread as to practically have the force of law.'" *Frederick Douglass Found., Inc.*, 82 F.4th at 1148 (quoting *Connick v. Thompson*, 563

---

[6] Valibeigi does not allege that the District took any action that would amount to a deprivation of his possessory rights to his property under the Fourth Amendment. *Cf. United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015). He also does not claim that any action by the District constituted a "taking" under the Fifth Amendment. *See* U.S. Const. Amend V ("[N]or shall private property be taken for public use, without just compensation.").

U.S. 51, 61 (2011)). Additionally, and fourth, a municipality's "deliberate indifference" to a substantial risk that municipal actors will violate constitutional rights can constitute an official policy. *Id.*[7]

Valibeigi has not plausibly alleged that the enforcement suits the District brought against him stemmed from an official municipal policy or custom. Though he asserts that "the District initiated policies . . . intensifying the enforcement" of the CPPA and the TRA, ECF No. 4 at 1–2—including, presumably, in the cases against him—that assertion alone, lacking any additional factual support, is insufficient to defeat a motion to dismiss. A plaintiff must provide more than such conclusory allegations or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 681. And even if his claim were more than conclusory, it would still be insufficient because a policy of "intensifying the enforcement" of the CPPA and TRA does not, without more, plausibly support a claim of selective enforcement. In other words, to say that the District decided to beef up its enforcement practices is not to suggest that it did so in a discriminatory manner that "caused the violation" of Valibeigi's rights. *See Baker*, 326 F.3d at 1306.

Valibeigi also tries to show an official policy or custom by alleging that the OAG maintained a practice of enforcing the CPPA and TRA only against landlords who owned property "in the poor areas of the city." *See* ECF No. 4 ¶ 24. And true, a court may infer the existence of a policy or custom when there is a "uniform and unexplained" practice exempting some, but not others, from the enforcement of a municipal ordinance. *Frederick Douglas Found.*, 82 F.4th at

---

[7] Only the third is relevant here. Valibeigi does not, for example, point to any specific legislative act of the District creating a policy of selective enforcement. Nor does he identify anyone who he plausibly alleges has policy-making authority. And he does not even gesture towards a deliberate-indifference theory.

1149. But in such cases, a plaintiff must generally allege "the ubiquitous non-enforcement of the ordinance against the many individuals" in one class and "the continued enforcement of the ordinance against other groups." *Id.* at 1149.

The information in the tables attached to the Amended Complaint does not meet this standard. As discussed above, that information says nothing about the relative merits of any specific case of enforcement or non-enforcement by the District. And even on its own terms, it comes up short. For example, the table shows that at least two of the twelve suits Valibeigi identifies as relevant were brought by the OAG against landlords with property in Ward 2, which he identifies as an affluent area. *See* ECF No. 4 at 18 (Table 1); *id.* ¶ 25 ("Wards 2 and 3 – have among the lowest poverty."). And the table shows that there was a third suit in an affluent area of Ward 4. *Id.* at 18. So Valibeigi has not plausibly alleged that there was any "uniform and unexplained" practice of discriminatory enforcement associated with the less affluent areas of the District so "ubiquitous" as to be District policy or custom. *See Frederick Douglas Found.*, 82 F.4th at 1149.

Valibeigi also fails to plausibly allege that it was the District's policy to treat small, private landlords differently than the DCHA by only suing the former under the CPPA and TRA and the latter under the NAA. On the contrary, his own table identifies two suits against small, private landlords brought under the NAA. ECF No. 4 at 18. That is the same number of suits brought under the NAA against the DCHA. *Id.* So, again, Valibeigi's allegations do not plausibly establish the existence of a practice that was "so persistent and widespread as to practically have the force of law." *Frederick Douglas Found.*, 82 F.4th at 1148 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Thus, Valibeigi has not plausibly alleged facts that would support a rational inference that the District acted under any official policy when it brough civil enforcement suits against him and

10

his companies, as described in the Amended Complaint.

**IV.    Conclusion**

For all the above reasons, the Court will grant the District's motion and dismiss the Amended Complaint.  Still, for now, the Court will not dismiss the case.  During the briefing, Valibeigi appears to have shown an interest in amending his complaint again.  *See* ECF No. 20 at 2.[8]  And the Court notes that he proceeds pro se.  Under the circumstances, the Court will provide him one final opportunity to file a complaint that passes muster.  Should he fail to do so, the Court will dismiss the case as well.  Thus, the Court will grant him thirty days to file a Second Amended Complaint.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 27, 2024

---

[8] Valibeigi may not, as he tried, amend his complaint through his opposition to the District's motion to dismiss.  *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007).  Thus, the Court does not consider the additional factual allegations Valibeigi made in that briefing, including those involving Mayor Muriel Bowser and Attorney General Karl Racine.